**F I L E D**
PUBLISH
**July 20, 2006**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

JOSE ROBERTO CARRIZALES-
TOLEDO,

Defendant-Appellant.

No. 05-2308

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**
**(D.C. NO. CR. NO. 05-856 JP)**

---

Dennis J. Candelaria, Assistant Federal Public Defender, Las Cruces, New Mexico, for the Defendant-Appellant.

Terri J. Abernathy, Assistant United States Attorney (David C. Iglesias, United States Attorney, with her on the brief), Las Cruces, New Mexico, for the Plaintiff-Appellee.

---

Before **O'BRIEN**, **McWILLIAMS**, and **McCONNELL**, Circuit Judges.

---

**McCONNELL**, Circuit Judge.

---

Jose Roberto Carrizales-Toledo was apprehended near the Mexican border driving a pickup truck containing over 500 pounds of marijuana. During his

initial detention, Mr. Carrizales-Toledo made self-incriminating statements to the border patrol agent before and after receiving the warnings required by *Miranda v. Arizona*, 384 U.S. 436 (1966). He entered a conditional plea of guilty to one count of possession with intent to distribute 100 or more kilograms of marijuana, reserving the right to appeal the district court's order denying his motion to suppress evidence of the marijuana and of his incriminating statements.

## I. BACKGROUND

On the morning of December 30, 2004, United States Border Patrol Agent Bernardo Ramirez was patrolling in a marked Border Patrol unit in the vicinity of Hachita, New Mexico. Hachita is a rural area in the "bootheel" region of New Mexico, close to the border between the United States and Mexico. Agent Ramirez had worked in this remote area for four years. On this particular morning he was patrolling alone.

Just before 9:00 a.m., Agent Ramirez turned onto Peterson Ranch Road, a single-lane dirt road that extends through private land (the Peterson Ranch) from New Mexico Highway 81 to the Mexican border. Agent Ramirez had previously encountered smuggling loads in the area, and less than a week earlier some of his colleagues had intercepted and seized a 900-pound load of marijuana on the road. After traveling east on Peterson Ranch Road for approximately three miles, Agent Ramirez encountered the Peterson family, who were driving in the opposite

direction. Agent Ramirez asked whether there would be any ranch personnel working further east on their property that day, and Mr. Peterson said there would not. The Petersons left and Agent Ramirez continued driving east toward the border.

After driving another mile down the road, Agent Ramirez saw a gray Chevrolet pickup truck driving toward him on the Peterson Ranch Road. He was approximately 12 to 15 miles from the border between the United States and Mexico at that time. Although Agent Ramirez was familiar with the local residents and their vehicles, he did not recognize the oncoming truck or its driver.

According to Agent Ramirez, as the vehicle approached he pulled to the side of the road to allow the driver to pass. Instead of driving past him, however, the driver stopped, looked behind him, and started driving backwards in an erratic manner. At that point Agent Ramirez suspected the driver was involved in unlawful activity. He began following the truck but did not engage his emergency lights or siren. After Agent Ramirez trailed the vehicle for about 100 yards, the driver of the truck suddenly brought his vehicle to a halt. Agent Ramirez applied his brakes, skidded a short distance, and came to a stop with his front bumper touching the front bumper of the truck.

After his vehicle had come to a stop, Agent Ramirez looked up and saw that the driver of the truck had his hands in the air. Agent Ramirez then exited

his vehicle, unholstered his firearm (but did not point it at the driver), yelled for the driver to keep his hands in the air, and began walking toward the passenger side of the truck. As Agent Ramirez approached the truck, he saw several square-shaped bundles wrapped in cellophane on the truck's passenger seat and floorboard area. He also saw a large blanket covering what appeared to be more bundles lying inside the extended cab of the truck. Based on his experience as a Border Patrol agent, he suspected that these bundles contained marijuana.

Upon reaching the passenger side of the truck, Agent Ramirez tried to open the passenger-side door but found that it was locked. The driver, later identified as Mr. Jose Roberto Carrizales-Toledo, used the electric-door locks to unlock the door. Agent Ramirez then opened the door and could immediately smell the marijuana inside the truck.

With the door open and Mr. Carrizales-Toledo's hands still in the air, Agent Ramirez asked the driver, in Spanish, "what he's doing." Motion Hearing Transcript ("Mot. Hr'g Tr.") 15. Mr. Carrizales-Toledo said he "was trying to get back to Mexico because he didn't want [the Agent] to catch him with all that stuff." *Id*. Agent Ramirez then asked him, "With what stuff?" *Id*. Mr. Carrizales-Toledo replied, "This stuff. The marijuana." *Id*.

At that point, Agent Ramirez walked to the other side of the truck, removed Mr. Carrizales-Toledo, placed him in handcuffs, and took him to his patrol car. Agent Ramirez put Mr. Carrizales-Toledo in the backseat and read him the

-4-

*Miranda* warnings in Spanish. Mr. Carrizales-Toledo indicated that he understood his rights, and agreed to make a statement without a lawyer being present. Agent Ramirez then called for assistance.

After two or three additional Border Patrol agents had arrived at the scene, the agents began questioning Mr. Carrizales-Toledo again. During this second interrogation, Mr. Carrizales-Toledo told the Agents that he was trying to cross into the United States but did not have enough money to hire a smuggler. He claimed that an unidentified male offered him $700 to smuggle the marijuana across the border into the United States. Mr. Carrizales-Toledo was supposed to drive the truck, loaded with marijuana, to a gas station on the outskirts of Deming, New Mexico, where he would deliver the truck and its contents to an unknown individual. After hearing this confession, the Agents brought Mr. Carrizales-Toledo back to the Border Patrol station, where he signed a document saying that he had been given the *Miranda* warnings.

On April 21, 2005, a federal grand jury in the District of New Mexico returned an indictment charging Mr. Carrizales-Toledo with possession with intent to distribute 100 or more kilograms of marijuana in violation of 21 U.S.C. § 841(a)(1) and 21 U.S.C. § 841(b)(1)(B). On May 3, 2005, Mr. Carrizales-Toledo filed a motion to suppress any statements and physical evidence seized as a result of his detention and arrest on December 30, 2004. The district court held an evidentiary hearing on the motion to suppress on May 17, 2005.

At the hearing, Agent Ramirez offered the preceding account of the circumstances surrounding their encounter. Mr. Carrizales-Toledo offered a different version of the events. For example, he claimed that he was the one who pulled to the side of the road, and that after his truck had stopped Agent Ramirez drove directly at him to block the truck's path. He also denied driving his truck in reverse after seeing the Border Patrol vehicle. The district court weighed the conflicting testimony of Agent Ramirez and Mr. Carrizales-Toledo, and found that Agent Ramirez's testimony was "more consistent, plausible, and credible." Order 7.

Based on Agent Ramirez's account of the events, the court held that the encounter between the agent and Mr. Carrizales-Toledo became a seizure within the meaning of the Fourth Amendment when the front bumper of the Border Patrol vehicle made contact with the front bumper of Mr. Carrizales-Toledo's truck, that Agent Ramirez had reasonable suspicion to conduct an investigative stop, and that the agent had probable cause to arrest Mr. Carrizales-Toledo. Consequently, the court denied Mr. Carrizales-Toledo's motion to suppress the evidence obtained in the search and seizure of his vehicle.

The court also denied the motion to suppress Mr. Carrizales-Toledo's self-incriminating statements, despite the lack of *Miranda* warnings before the defendant first admitted to having marijuana in the truck. It found that even if Mr. Carrizales-Toledo was in custody during the initial questioning, a reasonable

officer in Agent Ramirez's situation would have been concerned over the possibility that there was a concealed weapon in the truck, and therefore the Agent's brief interrogation falls under the "public safety" exception to *Miranda*.

On June 6, 2005, Mr. Carrizales-Toledo entered a conditional plea of guilty to the Indictment, reserving the right to appeal the district court's order denying the suppression motion. The court entered judgment against Mr. Carrizales-Toledo on September 19, 2005, and sentenced him to 60 months in prison.[1]

## II.  DISCUSSION

### A. The Investigative Stop

The Fourth Amendment protects the "right of people to be secure . . . against unreasonable searches and seizures." U.S. Const. amend. IV. "A traffic stop is a Fourth Amendment seizure 'even though the purpose of the stop is limited and the resulting detention quite brief.'" *United States v. Alcaraz-Arellano*, 441 F.3d 1252, 1257 (10th Cir. 2006) (*quoting Delaware v. Prouse*, 440 U.S. 648, 653 (1979)). Nonetheless, an initial traffic stop does not run afoul of the Constitution if the officer has "probable cause, or at least articulable

---

[1]The imprisonment range for Mr. Carrizales-Toledo prescribed in the United States Sentencing Commission Guidelines was 37 to 46 months. Pursuant to 21 U.S.C. § 841(b)(1)(B), however, the statutory imprisonment range was five to forty years. The district court sentenced Mr. Carrizales-Toledo to the statutory minimum, 60 months' imprisonment.

reasonable suspicion, that there has been a criminal violation or that there is evidence of criminal activity in the vehicle." *United States v. Herrera*, 444 F.3d 1238, 1242 (10th Cir. 2006). After considering the evidence presented at the suppression hearing, the district court below found that Agent Ramirez had reasonable suspicion to conduct an investigative detention of Mr. Carrizales-Toledo and his truck. "We accept the trial court's factual findings unless clearly erroneous, and view the evidence in the light most favorable to the district court's finding." *United States v. Laughrin*, 438 F.3d 1245, 1247 (10th Cir. 2006) (internal quotation marks omitted). The ultimate determination of reasonableness under the Fourth Amendment is reviewed de novo. *Id*.

In *United States v. Brignoni-Ponce*, 422 U.S. 873 (1975), the Supreme Court set forth a non-exhaustive list of factors that courts may consider when determining whether a traffic stop in a border area was justified by reasonable suspicion of unlawful activity:

> (1) characteristics of the area in which the vehicle is encountered; (2) the proximity of the area to the border; (3) the usual patterns of traffic on the particular road; (4) the previous experience of the agent with alien traffic; (5) information about recent illegal border crossings in the area; (6) the driver's behavior, including any obvious attempts to evade officers; (7) aspects of the vehicle, such as a station wagon with concealed compartments; and (8) the appearance that the vehicle is heavily loaded.

*United States v. Quintana-Garcia*, 343 F.3d 1266, 1270 (10th Cir. 2003) (*citing Brignoni-Ponce*, 422 U.S. at 874–75). When weighing these factors, courts must

look at the totality of the circumstances to determine whether the officer had a particularized and objective basis for suspecting unlawful activity. *Id*.

Mr. Carrizales-Toledo does not dispute that the first five *Brignoni-Ponce* factors weigh in favor of the government's position that the Agent had reasonable suspicion for the stop. The encounter took place in a remote and rural area of New Mexico on a single-lane dirt road that leads directly to the border between the United States and Mexico, only 12 to 15 miles from the border; Agent Ramirez was familiar with the local residents and vehicles in the area and did not recognize Mr. Carrizales-Toledo or his truck; normally there was only ranch traffic on the road at that hour, and the ranch owner had told Agent Ramirez that no one would be working further east toward the border with Mexico that day; Agent Ramirez had previously experienced alien traffic and illegal border crossings in the area; and the agent knew that a large load of marijuana had been seized in the area less than a week earlier.

Additionally, we find that the sixth *Brignoni-Ponce* factor, Defendant's reaction to seeing the Border Patrol vehicle, also supports the district court's finding that Agent Ramirez had reasonable suspicion for the initial detention. The district court made a factual finding that "[f]rom the agent's perspective, Defendant appeared to stop his truck, reverse direction, and move away from the agent's vehicle in an abrupt and erratic manner even though the agent had not yet blocked his path or made any show of official authority." Order 20. The court

determined that "[f]rom this standpoint, Defendant's actions could reasonably and objectively be viewed as evasive or suspicious"; and therefore "support[] the reasonableness of the agent's suspicions." *Id*.

Mr. Carrizales-Toledo claims that his driving was not suspicious because after backing up he stopped at a wide point in the road, and that a reasonable officer should have known that he was attempting to allow the agent to pass him. Yet Mr. Carrizales-Toledo does not challenge the district court's finding that Agent Ramirez had already pulled his Border Patrol vehicle to the side of the road and left enough room for the truck to pass. Moreover, the reasonable suspicion standard does not require that Border Patrol agents be able to rule out all potentially innocent explanations for a suspect's behavior before making a stop. It is not impossible that Mr. Carrizales-Toledo was driving backwards to find a safer place for the two vehicles to pass. Nonetheless, since there was already enough room for the truck to pass, and Mr. Carrizales-Toledo was driving away from the Agent and toward the border in an erratic manner, we agree with the district court that an agent could reasonably view his behavior as suspicious.

Considering the totality of the circumstances surrounding the investigative detention, we agree with the district court that Agent Ramirez had a reasonable suspicion that Mr. Carrizales-Toledo was engaged in illegal activities and that the initial stop therefore did not violate Mr. Carrizales-Toledo's Fourth Amendment rights.

**The *Miranda* Issue**

In *Miranda v. Arizona*, the Supreme Court concluded that "the process of in-custody interrogation of persons suspected or accused of crime contains inherently compelling pressures which work . . . to compel him to speak where he would not otherwise do so freely." 384 U.S. 436, 467 (1966). To guard against this danger, the Court requires that "the accused must be adequately and effectively apprised of his rights and the exercise of those rights must be fully honored." *Id*. Absent these specific warnings, there is "a presumption of coercion" for custodial confessions "that is generally irrebuttable for purposes of the prosecution's case in chief." *United States v. Patane*, 542 U.S. 630, 639 (2004).

During the events leading up to and after his arrest, Mr. Carrizales-Toledo made two self-incriminating statements to Agent Ramirez regarding the marijuana in his truck. The first was when Agent Ramirez initially stopped Mr. Carrizales-Toledo, approached the passenger-side of the pickup truck he was driving, and asked him "what he's doing." Mot. Hr'g Tr. 15. Mr. Carrizales-Toledo answered that he "was trying to get back to Mexico because he didn't want [the Agent] to catch him with all of that stuff," in reference to the more than 500 pounds of marijuana sitting on the passenger seat and in the cab of the truck. *Id*. Mr. Carrizales-Toledo made his second self-incriminating statement after he was arrested and read the *Miranda* warnings. He agreed to make another statement

-11-

without the presence of an attorney, and after two or three more Border Patrol agents had arrived, he told the agents that he had been paid $700 to smuggle the marijuana across the border. At the suppression hearing, Mr. Carrizales-Toledo argued that his first confession was inadmissible because the Agent failed to tell him the *Miranda* warnings beforehand; he then argued that his second confession was inadmissible because it was a direct result of the first. He repeats those arguments on appeal.

The district court held that "the agent's brief initial questioning about what Defendant was doing and what was in the truck falls under the public-safety exception" to *Miranda*, and therefore "provides no basis for suppressing the [two] statements." Order 25. As the government concedes, this Court has not considered application of the public safety exception outside the context of questioning regarding firearms or weapons. Appellee's Br. 19. Because it is not necessary to resolution of this case, we decline to address that legal question. As an alternative ground for affirmance, the government argues that at the time of the initial encounter, Mr. Carrizales-Toledo was not in custody, and thus that *Miranda* is inapplicable. The district court, however, assumed for purposes of the suppression motion that Mr. Carrizales-Toledo was in custody at the time of the initial encounter. Because the record is not sufficiently clear regarding the facts bearing on that conclusion, we choose not to address the government's argument.

Instead, we rely on a ground fully supported by the record and argued on appeal by both parties. "We are free to affirm the district court's decision on any ground supported by the record." *United States v. Hauk*, 412 F.3d 1179, 1185 (10th Cir. 2005). We hold that Mr. Carrizales-Toledo's second confession, which was voluntary and occurred after the *Miranda* warnings were given, was admissible, thus curing any potential concerns regarding the initial statements.

The Supreme Court first addressed this issue in *Oregon v. Elstad*, 470 U.S. 298 (1985). In *Elstad*, police officers went to the defendant's home and questioned him about a burglary without first reading him the *Miranda* warnings. *Id*. at 301. The defendant admitted being present at the burglary, at which point the officers took him to the police station. *Id*. An hour after arriving at the station, the officers informed the defendant of his *Miranda* rights. *Id*. The defendant then waived those rights and gave a full statement detailing his role in the crime. *Id*. at 301–02. The Court held that "[t]hough *Miranda* requires that the unwarned admission must be suppressed, the admissibility of any subsequent statement should turn in these circumstances solely on whether it is knowingly and voluntarily made." *Id*. at 309. It rejected the theory that the initial, unwarned statement creates a "lingering compulsion" based on "the psychological impact of the suspect's conviction that he has let the cat out of the bag and, in so doing, has sealed his own fate." *Id*. at 311. "[A]bsent deliberately coercive or improper tactics in obtaining the initial statement," the Court found that

-13-

"subsequent administration of *Miranda* warnings . . . ordinarily should suffice to remove the conditions that precluded admission of the earlier statement." *Id*. at 314.

The Supreme Court revisited this issue in *Missouri v. Seibert*, 542 U.S. 600 (2004). Unlike *Elstad*, where "the officer's initial failure to warn was an 'oversight,'" *id*. at 614, in *Seibert* the police "used a two-step questioning technique based on a deliberate violation of *Miranda*," *id*. at 620 (Kennedy, J., concurring in the judgment). The interrogating officer began questioning the suspect without providing the *Miranda* warnings; after the suspect confessed, the officer gave the warnings and resumed the questioning to lead the suspect back over the same ground. *Id*. at 604 (plurality). The Court found that the interrogating officers had withheld the *Miranda* warnings from the suspect "to obscure both the practical and legal significance of the admonition when finally given," *id*. at 620 (Kennedy, J.), and that the interrogation reflected a strategy "dedicated to draining the substance out of *Miranda*," *id*. at 617 (plurality).

Although the Court held that statements obtained through such a two-step technique are inadmissible, none of the opinions in *Seibert* received the votes of five Justices. The plurality opinion, which was joined by four of the Justices, held that "[t]he threshold issue when interrogators question first and warn later is . . . whether it would be reasonable to find that in these circumstances the warnings could function 'effectively' as *Miranda* requires." *Id*. at 611–12. Any

-14-

*Miranda* warning "inserted in the midst of [a] coordinated and continuing interrogation" is problematic; and unless "a reasonable person in the suspect's shoes could have seen the station house questioning as a new and distinct experience, [and thus] the *Miranda* warnings could have made sense as presenting a genuine choice whether to follow up on the earlier admission," the plurality would find the postwarning statements inadmissible. *Seibert*, 542 U.S. at 614–16. The plurality set forth five "relevant facts that bear on whether *Miranda* warnings delivered midstream could be effective":

> [1] the completeness and detail of the questions and answers in the first round of interrogation, [2] the overlapping content of the two statements, [3] the timing and setting of the first and the second, [4] the continuity of police personnel, and [5] the degree to which the interrogator's questions treated the second round as continuous with the first.

*Id*. at 615. These factors, all of which concern the relationship between the first and second interrogations, are intended to aid courts in determining whether an initial, unwarned interrogation operated to "thwart *Miranda*'s purpose of reducing the risk that a coerced confession would be admitted." *Id*. at 617.

Justice Kennedy concurred in the judgment, but on what he described as "narrower" grounds. *Id*. at 622 (Kennedy, J.). Like the plurality, Justice Kennedy wrote that "[t]he interrogation technique used in this case is designed to circumvent *Miranda v. Arizona*," and "statements obtained through the use of this technique are inadmissible." *Id*. at 618. For Justice Kennedy, however, the

-15-

plurality's test, which "envisions an objective inquiry from the perspective of the suspect, and applies in the case of both intentional and unintentional two-stage interrogations, . . . cuts too broadly." *Id*. at 621–22. Instead, he believed that unless the police used "the two-step interrogation technique . . . in a calculated way to undermine the *Miranda* warning," then "[t]he admissibility of postwarning statements should continue to be governed by the principles of *Elstad*." *Id*. at 622. In those "infrequent case[s]" where the interrogating officer deliberately uses the two-step strategy, "postwarning statements that are related to the substance of prewarning statements must be excluded unless curative measures are taken before the postwarning statement is made." *Id*. If the two-step method was used deliberately, the interrogating officer must take "curative measures . . . designed to ensure that a reasonable person in the suspect's situation would understand the import and effect of the Miranda warning," such as "a substantial break in time and circumstances between the prewarning statement and the *Miranda* warning," or "an additional warning that explains the likely inadmissibility of the prewarning custodial statement." *Id*.

The plurality resisted Justice Kennedy's attempt to redirect the Court's inquiry to the intent of the interrogating officer. According to the plurality, "[b]ecause the intent of the officer will rarely be as candidly admitted as it was here . . . , the focus is on facts apart from intent that show the question-first tactic at work." *Id*. at 616 n.6 (plurality). The four dissenting Justices applauded what

they described as "[t]he plurality's rejection of an intent-based test," explaining that because the Fifth Amendment "requires us to assess whether a suspect's decision to speak truly was voluntary[,] . . . we focus our analysis on the way in which suspects experience interrogation." *Id*. at 624 (O'Connor, J., dissenting). Ultimately, however, the dissent concluded that "the plurality gives insufficient deference to *Elstad*," and states that the Court should have "analyze[d] the two-step interrogation procedure under the voluntariness standards central to the Fifth Amendment." *Id*. at 628–29.

Ordinarily, where "a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgements on the narrowest grounds." *Marks v. United States*, 430 U.S. 188, 193 (1977) (internal quotation marks omitted). That might seem to be the Kennedy concurrence. *United States v. Mashburn*, 406 F.3d 303, 308-09 (4th Cir. 2005).

In practice, however, the *Marks* rule produces a determinate holding "only when one opinion is a logical subset of other, broader opinions." *King v. Palmer*, 950 F.2d 771, 781 (D.C. Cir. 1991) (en banc). When the plurality and concurring opinions take distinct approaches, and there is no "narrowest opinion" representing the "common denominator of the Court's reasoning," then *Marks* becomes "problematic." *Id*. at 781, 782; *see, e.g., Nichols v. United States*, 511

-17-

U.S. 738, 745 (1994) (discussing the lower courts' treatment of *Baldasar v. Illinois*, 446 U.S. 222 (1980)); *Grutter v. Bollinger*, 539 U.S. 306, 325 (2003) (discussing the lower courts' treatment of *Regents of University of California v. Bakke*, 438 U.S. 265 (1978)). We do not apply *Marks* when the various opinions supporting the Court's decision are mutually exclusive. *See Homeward Bound, Inc. v. Hissom Mem'l Ctr.*, 963 F.2d 1352, 1359 (10th Cir. 1992) (*citing King*, 950 F.2d at 782).

Determining the proper application of the *Marks* rule to *Siebert* is not easy, because arguably Justice Kennedy's proposed holding in his concurrence was rejected by a majority of the Court. *See United States v. Rodriguez-Preciado*, 399 F.3d 1118, 1138–41 (9th Cir. 2005) (Berzon, J., dissenting in part). As Judge Berzon explained, "three of the four Justices in the plurality *and* the four dissenters decisively rejected any subjective [test] . . . based on deliberateness on the part of the police." *Id*. at 1139. This case does not require us to determine which opinion reflects the holding of *Seibert*, however, since Mr. Carrizales-Toledo's statements would be admissible under the tests proposed by the plurality and by the concurring opinion.

Applying the plurality's five "relevant facts" to this case, we find that the *Miranda* warning provided to Mr. Carrizales-Toledo was sufficient to inform him that he could choose whether to continue his confession in the second interrogation. Under the first factor, we look at "the completeness and detail of

-18-

the questions and answers in the first round of interrogation." *Seibert*, 542 U.S. at 615. Agent Ramirez merely asked Mr. Carrizales-Toledo "what he's doing"; and Defendant offered a brief (albeit damning) reply that he was trying to evade the agent to avoid being caught with "that stuff." Mot. Hr'g Tr. 15. Agent Ramirez then asked him, "With what stuff?" *Id.* Mr. Carrizales-Toledo replied, "This stuff. The marijuana." *Id.* Assuming these questions even amount to a custodial interrogation, they fall far short of the interrogator's conduct in *Seibert*, where "the [initial] questioning was systematic, exhaustive, and managed with psychological skill." *Seibert*, 542 U.S. at 616. The brevity and spontaneity of Agent Ramirez's initial questioning reduced the likelihood that it undermined the subsequent *Miranda* warnings given to Mr. Carrizales-Toledo.

The second factor is the extent of "the overlapping content of the two statements." *Id.* at 615. Mr. Carrizales-Toledo provided significant new information to the Agent during the second questioning, including where he received the marijuana, what he was paid for transporting it, and his intended destination. In contrast, the interrogating officers in *Seibert* covered the same ground in both rounds of questioning, which the plurality believed could aggravate "any uncertainty on [the suspect's] part about a right to stop talking about matters previously discussed." *Id.* at 616. The differing content of Mr. Carrizales-Toledo's first and second confessions further suggests that the initial interrogation did not undermine the *Miranda* warnings.

-19-

The third and fourth factors are "the timing and setting of the first and second" interrogations and "the continuity of police personnel," respectively. *Id.* at 615. After the first round of questioning, Agent Ramirez removed Mr. Carrizales-Toledo from his vehicle, arrested him, placed him in handcuffs, put him in the backseat of the Border Patrol vehicle, waited for two or three more agents to arrive, and had the other agents participate in the second round of questioning. The time lapse between the first and second interrogation, the presence of additional officers, and the change in location all allowed Mr. Carrizales-Toledo to see that the second round of questioning was "a new and distinct experience" rather than a "coordinated and continuing interrogation." *Id.* at 615, 613. Because the questioning was broken up into two distinct sessions, the midstream *Miranda* warnings were more likely to have had their intended effect.

The fifth, and perhaps the most important, factor is "the degree to which the interrogator's questions treated the second round as continuous with the first." *Id.* at 615. The plurality expressed concern about officers in the second interrogation referring back to the confession already given, believing that such references create the impression that the second interrogation is a "mere continuation" of the first, and that it would be "unnatural" for the suspect "to refuse to repeat . . . what had been said before." *Id.* at 616–17. These concerns are inapposite in this case, however, since there is no evidence that the agents

-20-

ever referred back to Mr. Carrizales-Toledo's initial statements during the second interrogation. Because all five of the "relevant facts" indicate that the *Miranda* warning given to Mr. Carrizales-Toledo was effective in preparing him for the successive interrogation, under the plurality's test in *Seibert* his statements are admissible.

We reach a similar conclusion applying the "narrower test" set forth by Justice Kennedy in his concurrence. *Id.* at 622. Justice Kennedy maintained that unless "the two-step interrogation technique was used in a calculated way to undermine the *Miranda* warning," the courts should follow "the principles of *Elstad*" when determining the admissibility of postwarning statements. *Id.* at 622. The evidence presented at the suppression hearing leaves little room for suspicion that Agent Ramirez intentionally withheld the *Miranda* warnings during the initial interrogation. The circumstances of the encounter, including the suddenness with which Mr. Carrizales-Toledo confessed, the fact that his confession was in response to Agent Ramirez's first question, and the open-ended nature of the question, all suggest that Agent Ramirez simply did not anticipate the confession when he asked Mr. Carrizales-Toledo "what he's doing." Moreover, because the initial conversation took place just after Agent Ramirez had stopped the truck, and Mr. Carrizales-Toledo was still in his vehicle at the time, it is likely that Agent Ramirez failed to provide the *Miranda* warning because at that point it was unclear whether Mr. Carrizales-Toledo was in custody.

Since Agent Ramirez's initial conversation with Mr. Carrizales-Toledo was not a deliberate two-step interrogation, the only remaining question with respect to the admissibility of his statements is whether they were voluntary. After the initial confession, Agent Ramirez apprised Mr. Carrizales-Toledo of his rights, and Mr. Carrizales-Toledo indicated that he understood those rights. In *Elstad*, the Court held that the subsequent administration of *Miranda* warnings after a voluntary but unwarned custodial confession will "remove the conditions that precluded admission of the earlier statement." 470 U.S. at 314. Unless his initial confession was involuntary, therefore, Mr. Carrizales-Toledo's motion to suppress the second confession was properly denied.

"The essence of voluntariness is whether the government obtained the statements by physical or psychological coercion such that the defendant's will was overborne." *United States v. Rith*, 164 F.3d 1323, 1333 (10th Cir. 1999). Courts typically consider five factors in a voluntariness inquiry: "(1) the age, intelligence, and education of the defendant; (2) the length of [any] detention; (3) the length and nature of the questioning; (4) whether the defendant was advised of [his or] her constitutional rights; and (5) whether the defendant was subjected to physical punishment." *United States v. Glover*, 104 F.3d 1570, 1579 (10th Cir. 1997). Mr. Carrizales-Toledo was 33 years old at the time of his arrest. He had received 14 years of formal education in Mexico and was apparently just one year shy of receiving a degree in chemical engineering. He made his self-

incriminating statement after being detained for less than a few minutes; and it was in response to a single open-ended question from the agent. Moreover, Mr. Carrizales-Toledo does not claim that he was subjected to any physical punishments or threats. Although Agent Ramirez had his weapon unholstered during the initial questioning, the district court found that he did not point it at the defendant or threaten him in any way. Considering these factors in their totality, we find that Mr. Carrizales-Toledo's initial statement was voluntary. His second confession was therefore properly admitted.

### III. CONCLUSION

The district court order denying Mr. Carrizales-Toledo's motion to suppress is therefore **AFFIRMED**.