Opinion by JUDGE GRAHAM
¶ 1 Defendant, James William Merritt, was found guilty of the second degree murder of Shirley Welch. He appeals his conviction and the sentence of thirty-six years in the custody of the Department of Corrections imposed by the district court.
¶ 2 This confrontation clause appeal asks us to determine whether an autopsy report prepared by a doctor who was not present at trial should be considered testimonial under Crawford v. Washington, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). We conclude that it should. We are further asked to determine whether an expert witness may refer to the absent doctor's testimonial statement in rendering his own opinion as to Welch's cause of death. Under the circumstances present here, he was properly permitted to do so.
I. Background
¶ 3 On January 23, 2008, a desk clerk at a hotel on East Colfax found Welch's body in the room where she had lived for about five years. Her throat had been cut and a large amount of blood was visible on her body and on the bed beneath her.
¶ 4 Dr. Lear-Kaul performed an autopsy and authored a report detailing her findings and conclusions regarding the cause and manner of Welch's death.
¶ 5 Police investigators eventually focused on defendant, who worked as a security guard at the hotel and had a pass key to all of the rooms. Investigators identified his DNA in samples taken from the victim's room and body. Police interrogated him on March 13, 2008, and later arrested him. They then searched his storage locker and found a knife.
¶ 6 Prior to trial, the defense filed a notice under section 16-3-309(5), C.R.S. 2014, demanding that "employees or technicians testify in person to the results of any laboratory results received in evidence in any court proceeding[.]"
¶ 7 The prosecution endorsed several witnesses who had performed tests or prepared forensic reports in this case, including Dr. Lear-Kaul. Approximately a month before trial, the prosecution notified the defense that in lieu of Dr. Lear-Kaul, who would be on maternity leave during the trial, Dr. Lear-Kaul's supervisor, Dr. Dobersen, would testify regarding Dr. Lear-Kaul's autopsy report and the cause of death.
¶ 8 Defendant filed a motion in limine, requesting that the court exclude Dr. Dobersen's testimony because Dr. Lear-Kaul's report was hearsay and testimony regarding the report violated defendant's Sixth Amendment right to confront his accusers. At a pretrial readiness conference on August 7, 2009, the court heard arguments from the parties on the issue.
*104 ¶ 9 The defense argued that because Dr. Lear-Kaul had conducted the autopsy and authored the report, the defense should have the opportunity to confront her, and allowing Dr. Dobersen to testify in her place about the contents of the autopsy report violated defendant's confrontation rights.
¶ 10 The defense also argued that the report was subject to section 16-3-309, which requires that when laboratory test results are to be offered into evidence, the person who actually performed the laboratory analysis must testify in person.
¶ 11 The prosecutor responded that defendant's rights would not be violated because autopsy reports are nontestimonial and fit within the business record exception to the hearsay rule. The prosecutor argued that Dr. Dobersen, as an expert witness, could rely on reports prepared by other people when testifying about his own independent expert assessment of the cause of the death. The prosecutor further asserted that section 16-3-309 was inapplicable because Dr. Dobersen would testify to his own, independent assessment of the cause and manner of death.
¶ 12 The court denied the defense's motion in limine, explaining that, based on case law and CRE 703, an expert can rely on the opinions of other experts, but may not function as "a mere conduit ... in adopting those opinions." The court cautioned that the ultimate admissibility of Dr. Dobersen's testimony depended on its actual content and the manner in which it was presented. The court also denied defendant's motion to continue the trial.
¶ 13 At trial, Dr. Dobersen was qualified as an expert in forensic pathology without objection. On direct examination, he testified that Dr. Lear-Kaul had performed the victim's autopsy in January 2008 and that he had reviewed her report as well as various crime scene and autopsy photographs.
¶ 14 Dr. Dobersen testified that the autopsy report disclosed that the victim had "a large, sharp force injury to her neck." He explained that he also saw sharp force injury to the neck in the photos he reviewed and that he was able to see damaged blood vessels and organs in those photos. During his testimony he used the photos as a visual aid to explain the injury to the jury.
¶ 15 He relied on the description of the injuries and findings in the autopsy report to give further specifics regarding the neck wound. For example, he stated, "looking at the description and some of the photographs, it looks like there may have been two" cuts to the neck. He also explained that he saw other injuries, including "sharp forced injuries to her hand" that he described as "relatively superficial," and which "could be interpreted as someone trying to protect themselves from being attacked."
¶ 16 He testified that "[t]he other finding is that there were at least two transections of the airways," and explained that both the voice box and the trachea were severed. He concluded from this finding that the "[o]nly way to get that would be two movements with a sharp instrument across the neck."
¶ 17 During direct examination, Dr. Dobersen also explained that, having reviewed the autopsy report, he had no reason to believe the victim had been poisoned.
¶ 18 Dr. Dobersen's ultimate opinion was that "her death was due to incised wounds to her neck by a sharp instrument," and that the "manner of death would be homicide."
¶ 19 At the conclusion of direct examination, the defense renewed its objection to Dr. Dobersen's testimony, asserting again that Dr. Lear-Kaul's report was testimonial.
¶ 20 During cross-examination, Dr. Dobersen observed that he could not determine whether the wounds were inflicted quickly or with a sawing motion, whether the wounds started from a certain direction, whether the attacker was a male or a female, or whether the attacker was right or left-handed, and that he could not determine the position of the victim's attacker.
¶ 21 Dr. Dobersen agreed with defense counsel that in making his determinations, there was no difference between observing the photographs and observing the victim's body.
¶ 22 During cross-examination, he testified that alcohol was present in the vitreous fluid *105 of Welch's eyes and that her blood-alcohol content was more than twice the legal limit.
¶ 23 On redirect examination, Dr. Dobersen testified that the level of alcohol in the victim's system was not high enough to have caused death from alcohol poisoning. He testified that there was a large amount of blood in the soft tissues, indicating that her neck had been cut while she was still alive, stating, "[I]t looks like she may have aspirated some of the blood, hemo aspiration. It indicates that someone is bleeding at the time they sustain the wound. She is actively bleeding blood into her lungs, which will show up as such at the autopsy."
¶ 24 At the end of Dr. Dobersen's testimony, the defense noted for the record that it had made multiple attempts to subpoena Dr. Lear-Kaul but had not been able to acquire a current address.
II. Standard of Review
¶ 25 We review Sixth Amendment Confrontation claims de novo. Bernal v. People, 44 P.3d 184, 198 (Colo. 2002). Confrontation Clause violations are trial errors. People v. Fry, 92 P.3d 970, 980 (Colo. 2004). Where, as here, a defendant preserves his claim for review by raising a contemporaneous objection, we review a constitutional trial error under the harmless beyond a reasonable doubt standard. People v. Miller, 113 P.3d 743, 745 (Colo. 2005).
III. Law
¶ 26 The Confrontation Clause, found in the Sixth Amendment to the United States Constitution, states that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him [.]" Article II, section 16 of the Colorado Constitution guaranties an accused the right "to meet the witnesses against him face to face[.]"
¶ 27 Prior to 2004, an unavailable witness's out-of-court statement could be admitted into evidence so long as it had adequate indicia of reliability. That reliability was established where the statement could be admitted under "a firmly rooted hearsay exception" or if it bore "particularized guarantees of trustworthiness." Ohio v. Roberts, 448 U.S. 56, 66, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980). Crawford, 541 U.S. at 52, 124 S.Ct. 1354, overruled Ohio v. Roberts, replacing its judicial determinations of reliability with an absolute bar to the admission of testimonial out-of-court statements absent a prior opportunity to cross-examine. Id . at 67-68, 124 S.Ct. 1354 ("By replacing categorical constitutional guarantees with open-ended balancing tests, we do violence to [the Framers'] design.").
¶ 28 Crawford established two conditions to determine when the admission of "testimonial statements" does not violate a defendant's rights under the Confrontation Clause. Id . at 52, 124 S.Ct. 1354. First, the witness must be unavailable to testify at trial. Id . Second, the defendant must have had a prior opportunity to cross-examine that witness. Id. The Colorado Supreme Court has adopted Crawford 's Confrontation Clause inquiry. Fry , 92 P.3d at 976.
¶ 29 Crawford limited its scope to "testimonial" statements. 541 U.S. at 51, 124 S.Ct. 1354. In interpreting the language of the Sixth Amendment, the Court noted that the Confrontation Clause applied to "witnesses" against the accused. Id. The Court defined witnesses as those who "bear testimony" and defined testimony as a " 'solemn declaration or affirmation made for the purpose of establishing or proving some fact.' " Id. (quoting 2 N. Webster, An American Dictionary of the English Language (1828)). The Court did not offer a comprehensive definition of "testimonial statement." It did, however, describe types of testimonial statements: ex-parte in-court testimony, affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, and pretrial statements that a declarant would reasonably expect to be used by the prosecution or to be made available for use at a later trial. Id . at 51-52, 124 S.Ct. 1354.
¶ 30 The United States Supreme Court has not directly ruled on whether an autopsy report or statements as to its contents should be considered testimonial evidence under a Confrontation Clause analysis. However, it has considered alleged Confrontation Clause *106 violations where the out-of-court statements were contained in scientific reports.
¶ 31 In Melendez-Diaz v. Massachusetts, 557 U.S. 305, 129 S.Ct. 2527, 174 L.Ed.2d 314 (2009), the Court ruled that forensic laboratory certificates-which asserted that a substance found in the defendant's car, and in the police cruiser in which he rode, was cocaine-were testimonial and could be admitted only through the preparers to avoid violating the defendant's rights under the Confrontation Clause. The Court rejected the prosecution's argument that the analysts who had prepared the reports were not "accusatory" witnesses and, therefore, the reports should not be considered testimonial. Id . at 313, 129 S.Ct. 2527. The court in Melendez-Diaz also rejected the argument that neutral scientific testing was not testimonial, reasoning that forensic evidence is "not uniquely immune from the risk of manipulation" or error. Id . at 318, 129 S.Ct. 2527. The Court ruled that the laboratory certificates were testimonial statements of witnesses admitted into evidence against the defendant and the defendant had been denied his right to cross-examine the declarants. Id . at 311, 129 S.Ct. 2527.
¶ 32 In Bullcoming v. New Mexico, 564 U.S. 647, 131 S.Ct. 2705, 180 L.Ed.2d 610 (2011), the Supreme Court considered the introduction of a certified blood-alcohol analysis report into evidence through an analyst who did not prepare the report. It concluded that the report was testimonial and should have been excluded. Id . at ----, 131 S.Ct. at 2717. The defendant was accused of driving while intoxicated and the laboratory report certified that his blood-alcohol level was well above the legal limit. Id . at ----, 131 S.Ct. at 2709. Though the results were generated by a machine requiring little, if any, interpretation by the individual analyst, the Court held that surrogate testimony at trial did not adequately accommodate the right to cross-examination which the Confrontation Clause demands. Id . at ----, 131 S.Ct. at 2715. The Court also reaffirmed its holding in Melendez-Diaz that a "document created solely for an 'evidentiary purpose,' ... made in aid of a police investigation, ranks as testimonial." Id . at ----, 131 S.Ct. at 2717.
¶ 33 Unlike Bullcoming and Melendez-Diaz, where prosecutors attempted to admit forensic reports into evidence through witnesses who had not created the reports, Williams v. Illinois, 567 U.S. 50, 132 S.Ct. 2221, 183 L.Ed.2d 89 (2012), addressed a forensic report that an expert trial witness relied upon in forming an expert opinion. There, a government expert relied upon a report from a diagnostic laboratory. Id . at 56, 132 S.Ct. at 2227. The report contained DNA profile analysis of samples taken from a rape victim. Id . The expert opined that the DNA profile in the report matched the defendant's DNA profile in a state database. Id . at 60-62, 132 S.Ct. at 2230. A plurality held that this testimony did not violate the defendant's rights under the Confrontation Clause. Id . at 78-79, 132 S.Ct. at 2240.
¶ 34 Writing for the plurality, Justice Alito explained that the contents of the report were not offered for the truth of the matter asserted, but rather as "basis evidence," which is allowed under Rule 703 of the Federal Rules of Evidence. Id . at 56, 132 S.Ct. at 2227. Federal Rule of Evidence 703 is similar to Colorado Rule of Evidence 703 and states:
An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed. If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted. But if the facts or data would otherwise be inadmissible, the proponent of the opinion may disclose them to the jury only if their probative value in helping the jury evaluate the opinion substantially outweighs their prejudicial effect.
Justice Alito reasoned that because Crawford reaffirmed the position that the Confrontation Clause's bar is limited to hearsay evidence, the bar does not apply to "basis evidence" offered under Federal Rule of Evidence 703. Id . at 70, 132 S.Ct. at 2235 ("[T]he Confrontation Clause 'does not bar the use of testimonial statements for purposes other than establishing the truth of the *107 matter asserted.' " (quoting Crawford, 541 U.S. at 59-60, n.9, 124 S.Ct. 1354 )).
¶ 35 The four dissenters, and Justice Thomas, who concurred in the judgment but disagreed with the plurality's reasoning, rejected the notion that "basis evidence" could be offered for a nonhearsay purpose. "There is no meaningful distinction between disclosing an out-of-court statement so that the factfinder may evaluate the expert's opinion and disclosing that statement for its truth." Id . at 106, 132 S.Ct. at 2257 (Thomas, J., concurring in the judgment). The dissent further criticized the plurality's position, stating that the "approach would allow prosecutors to do through subterfuge and indirection what we previously have held the Confrontation Clause prohibits." Id . at 132, 132 S.Ct. at 2272 (Kagen, J., dissenting).
¶ 36 The plurality offered a second basis for allowing the statements into evidence, asserting that even if the DNA report had been introduced for its truth, the report was not testimonial evidence because it "was not prepared for the primary purpose of accusing a targeted individual." Id . at 84, 132 S.Ct. at 2243. Justice Alito cited Melendez-Diaz and Bullcoming as holding that not all forensic reports are testimonial statements. "Introduction of the reports in those cases ran afoul of the Confrontation Clause because they were the equivalent of affidavits made for the purpose of proving the guilt of a particular criminal defendant at trial." Id . The primary purpose of the DNA report, according to the plurality, was not to accuse a targeted individual or to inculpate a suspect by creating evidence for use at trial, but rather "to catch a dangerous rapist who was still at large." Id .
¶ 37 The dissenters and Justice Thomas asserted that the "primary purpose" approach has no support in history or precedent. Id . at 114-15, 132 S.Ct. at 2262. They also expressed concern that while an accusation test might be useful in cases where the lab technician acts with malicious purpose to frame a suspect, it does not address the presumably more common and equally problematic issue of mistake or incompetence that are just as likely to occur before police identify a suspect. Id . at 121-23, 132 S.Ct. at 2266.
¶ 38 In his concurrence, Justice Thomas concluded that the lab report was not testimonial evidence because it lacked the "solemnity" of a sworn affidavit or testimony under oath. Id . at 103, 132 S.Ct. at 2255.
¶ 39 Given the absence of majority support for any of the reasoning behind the outcome of Williams, it provides no clear guidance as to the current state of the law regarding the testimony of experts whose opinions are based on forensic reports which they themselves did not prepare. If a Supreme Court decision does not include a majority opinion, courts may seek the holding of the case in the narrowest position taken by the justices who concurred in the judgment. See Marks v. United States, 430 U.S. 188, 193, 97 S.Ct. 990, 51 L.Ed.2d 260 (1977). "In practice, however, the Marks rule produces a determinative holding 'only when one opinion is a logical subset of other, broader opinions.' " United States v. Carrizales-Toledo, 454 F.3d 1142, 1151 (10th Cir. 2006) (quoting King v. Palmer, 950 F.2d 771, 781 (D.C. Cir. 1991) (en banc)). In Williams, the plurality and the concurring opinions took mutually exclusive approaches; neither rationale supporting the judgment fits entirely within a broader rule proposed by the other opinion. Thus, the holding in Williams is not entirely helpful.
IV. Analysis
¶ 40 We first address the question of whether the information provided in the autopsy report was "testimonial evidence" under Crawford .
¶ 41 The People rely on the Williams plurality's accusation test to argue that the autopsy report was nontestimonial because when Dr. Lear-Kaul performed the autopsy, the police had not yet identified Merritt as a suspect. Because the investigation did not focus on defendant until months after the autopsy report was prepared, the People argue that its primary purpose was not to accuse defendant or to create evidence for use against defendant at trial, but rather to catch a dangerous murderer who was still at large. Alternatively, they suggest that the *108 report's primary purpose was to determine the cause and manner of the victim's death but not with the goal of building a case against defendant. Therefore, they reason, under the plurality's primary purpose test in Williams, the autopsy was nontestimonial.
¶ 42 Defendant argues that the autopsy report was testimonial because, as described in Crawford, an objective witness would reasonably believe that the information provided in the report would be available for use at a later trial. 541 U.S. at 51-52, 124 S.Ct. 1354. He asserts that the autopsy process is inherently investigative and conducted in coordination with police, pointing out that the police department requests the coroner's assistance when confronting a suspected homicide or suicide and that a crime scene investigator from the police department is present during the autopsy. The defense asserts that because the coroner's office is legally required to investigate suspicious deaths, it must expect that its findings will be used to prosecute if the findings conclude that a death may have been the result of foul play.
¶ 43 Coroners perform autopsies for a variety of reasons. Autopsies determine the cause and manner of death on behalf of police, but the information may be used by insurance companies and tort lawyers to determine civil liability, or by curious family members who are baffled by the unexplained death of a loved one. Even within the context of a criminal investigation the autopsy findings may be useful for different purposes and to varying degrees. They may be used simply to identify or rule out causes of death. The findings may also be used to build a case against an individual. Information such as time of death may play a key role in convicting or exonerating a suspect. The examination of a body might help identify a murder weapon or reveal details about a killer such as his height, dominant hand, or physical strength.
¶ 44 In analyzing a statement to determine whether or not it is testimonial, courts rely heavily on the purpose for which it was given. See Michigan v. Bryant, 562 U.S. 344, 131 S.Ct. 1143, 1155, 179 L.Ed.2d 93 (2011) (a statement is testimonial when its primary purpose is to create an out-of-court substitute for trial testimony); Davis v. Washington, 547 U.S. 813, 822, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006) (whether an interrogation is testimonial is contingent on whether its primary purpose is to help police resolve an ongoing emergency or to establish past events which could be used in a later criminal prosecution); Hinojos-Mendoza v. People, 169 P.3d 662, 667 (Colo. 2007) (lab report was testimonial because its sole purpose was to analyze a substance in anticipation of a criminal prosecution). Because autopsies may be conducted for a wide variety of reasons, whether an autopsy report is or is not testimonial is highly influenced by attendant circumstances.
¶ 45 The circumstances surrounding the victim's death in this case and the ensuing autopsy suggest that the autopsy report was created primarily for the purpose of gathering evidence to use in the eventual prosecution of a murder suspect.
¶ 46 The crime scene and nature of the injuries immediately suggested that the death was a homicide. A gaping neck wound suffered in a hotel room immediately suggests a homicide, whereas it is harder to imagine that such a wound could have resulted from an accident or suicide. A coroner called to such a scene cannot help but begin his investigation with the understanding that his findings are likely to assist in a criminal investigation.
¶ 47 The involvement of police under these circumstances would also cause an objective coroner to believe that the autopsy results would be used to investigate and prosecute a crime. Dr. Dobersen testified that the coroner's "mission is to investigate deaths of a sudden and unexpected nature, especially in violent circumstances. It is our constitutional mandate to do that." Colorado requires the coroner to work closely with law enforcement. Section 30-10-606(1), C.R.S. 2014, states that the "responding law enforcement agency shall notify the coroner when a death is discovered.... The coroner shall immediately notify the district attorney ... and ... proceed to the scene to view the body.... The coroner, in cooperation with law enforcement, shall make all proper inquiry *109 in order to determine the cause and manner of death...." (Emphasis added.) The statute continues: "When in the course of a coroner investigation, a death becomes suspicious or the possibility of criminal activity arises, the coroner shall immediately consult with the district attorney and law enforcement in the jurisdiction where the events that caused the death occurred." § 30-10-606(1.2)(f).
¶ 48 Given the state of the body, the nature of the crime scene, and the statutorily mandated cooperation between the coroner's office and the district attorney's office, under the circumstances of this case, it was reasonable for Dr. Lear-Kaul to assume that the report containing her findings and conclusions would be used prosecutorially.
¶ 49 Because it was reasonable for Dr. Lear-Kaul to assume the statements in her autopsy report would be used in a criminal prosecution, the statements were testimonial under Crawford . Because the statements were testimonial, Dr. Lear-Kaul was available, and defendant had not had the opportunity to cross-examine her, if Dr. Lear-Kaul's statements were admitted at trial for their truth, that admission violated defendant's rights under the Confrontation Clause.
¶ 50 We must now decide whether Dr. Dobersen's testimony at trial included testimonial statements from the autopsy report and, if so, whether the admission of the statements was harmless beyond a reasonable doubt.
¶ 51 The autopsy report itself was not admitted into evidence and so we are left to examine what portions of Dr. Dobersen's testimony contained testimonial statements authored by Dr. Lear-Kaul.
¶ 52 Much of Dr. Dobersen's testimony contained statements that could have been based solely on photographs taken during the autopsy and at the crime scene. Dr. Dobersen and defense counsel agreed that "there is no difference between observing these clear photos as opposed to actually viewing [the victim's] body itself." Any testimony that Dr. Dobersen gave regarding the visible neck wound could just as easily have been based on the photographic exhibits admitted at trial as on anything contained in the autopsy report. Any testimony regarding how many cuts were present, what blood vessels and airways had been severed, the amount of blood on and around the body, anything having to do with the visible characteristics of the neck wound, as well as the cuts to her hands, were admissible at trial based on his direct observations. These statements could have been presented to the jury as independent expert testimony under CRE 703 regardless of Dr. Lear-Kaul's absence. Consequently, even if some of them were also contained in the autopsy report, their admission into evidence was harmless beyond a reasonable doubt.
¶ 53 Not having seen the report, we are left to assume that any testimony that Dr. Dobersen gave about the condition of the victim's body that would not have been visible in the autopsy or crime scene photos must have been based on Dr. Lear-Kaul's testimonial statements.
¶ 54 During Dr. Dobersen's direct testimony he stated that there was nothing in the autopsy report that gave him any reason to believe the victim had been poisoned. Assuming that this conclusion was based solely on the autopsy report, no harm to the defendant could have been caused by it. The defendant did not suggest that Welch had been poisoned. His defense was that he was not the murderer, if in fact she was murdered. Dr. Dobersen's statement of his opinion on poisoning, while based on his reading of the autopsy report, did not read to the jury any of the testimonial statements within the report.
¶ 55 During cross-examination, defense counsel attempted to probe Dr. Dobersen's opinion about the cause and manner of death. Defense counsel asked if the coroner had found alcohol in Welch's body. Dr. Dobersen confirmed that alcohol was present. Defense counsel then went on to ask for specific facts that were necessarily included in the autopsy report. Dr. Dobersen testified that alcohol was present in the vitreous fluid of the victim's eye, and that her blood-alcohol content was more than twice the legal limit. This information, directly elicited by the defense, was admissible under CRE 705, *110 requiring the expert to disclose the underlying facts on cross-examination. Furthermore, even if Dr. Dobersen's answers to defense counsel's questions were hearsay, under our invited error doctrine, "a party may not complain on appeal of an error that he has invited or injected into the case; he must abide the consequences of his acts." People v. Zapata, 779 P.2d 1307, 1309 (Colo. 1989).
¶ 56 A division of this court has concluded that the introduction by defense counsel of testimonial statements during cross-examination opens the door to the prosecution's redirect examination and the admission of related testimonial statements and constitutes a waiver of the right to confrontation. People v. Rogers, 2012 COA 192, ¶¶ 21-22, 317 P.3d 1280 ; see also United States v. Lopez-Medina, 596 F.3d 716, 732 (10th Cir. 2010). The Rogers division held that "[w]here, as here, defense counsel intentionally opens the door on a particular (and otherwise inadmissible) line of questioning, such conduct operates as a limited waiver allowing the [P]eople to introduce further evidence on that same topic." Rogers, ¶ 15 (citing Lopez-Medina, 596 F.3d at 731 ).
¶ 57 "The general standard for the waiver of a constitutional right is an intentional relinquishment of a known right or privilege." People v. Montour, 157 P.3d 489, 498 (Colo. 2007). The Rogers division held that a defense counsel's intentional decision not to exercise a defendant's confrontation rights can be an effective waiver. Rogers, ¶ 20 ; see also Lopez-Medina, 596 F.3d at 731 ("[C]ounsel in a criminal case may waive a client's Sixth Amendment right of confrontation by opening the door, 'so long as the defendant does not dissent from his attorney's decision and so long as it can be said that the attorney's decision was a legitimate trial tactic [.]' " (quoting United States v. Aptt, 354 F.3d 1269, 1282 (10th Cir. 2004) )).
¶ 58 Defense counsel's line of questioning about alcohol in the body deliberately elicited testimonial statements to cast doubt on Dr. Dobersen's prior testimony that a sharp force injury to the throat caused Welch's death. By introducing evidence of a high level of alcohol in the body, defense counsel was attempting to present a theory that Welch may have died of other causes prior to receiving the neck wound. The decision to introduce testimonial statements about the alcohol was thus an intentional trial tactic by defense counsel. By opening the door to a line of questioning about alternative causes of death which relied upon facts contained in the autopsy report, defendant's confrontation rights were effectively waived.
¶ 59 During redirect examination, Dr. Dobersen stated that there was a large amount of blood in the soft tissues and that the victim had breathed blood into her lungs. Both of these facts supported his conclusion that the cause of death was a sharp force injury to the throat, and rebutted defense counsel's suggestion that Welch had died of other causes before sustaining the injury. Although these facts could not have been independently deduced by looking at the photographs and were likely testimonial statements from the autopsy report, because defense counsel opened the door to any Confrontation Clause violation, any potential error was waived. See Rogers, ¶ 20.
V. Conclusion
¶ 60 We conclude that the autopsy report prepared by Dr. Lear-Kaul and the information within it was testimonial evidence. Dr. Dobersen's testimony on direct examination was permissible expert opinion derived from his observations, and the fact that there may have been an identical analysis of the cause of death contained in the report was harmless beyond a reasonable doubt. Dr. Dobersen's redirect examination may have included testimonial statements from the autopsy report. However, because defense counsel opened the door to any Confrontation Clause violation related to these statements on cross examination, defendant waived his right to challenge the error.
¶ 61 The judgment is affirmed.
*111 JUDGE Fox and JUDGE Plank* concur.

Sitting by assignment of the Chief Justice under provisions of Colo. Const. art. VI, § 5 (3), and § 24-51-1105, C.R.S. 2014.